Filed 12/24/15  P. v. McDade CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WILLIE MCDADE,<br><br>　　　　Defendant and Appellant. | B256545<br><br>(Los Angeles County<br>Super. Ct. No. SA084422) |

　　　　APPEAL from an order of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

　　　　Willie McDade, in pro. per.; and Kevin Michele Finkelstein, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, defendant Willie McDade was convicted of one count of first degree burglary. (Pen. Code § 459.)[1] Defendant timely appealed. After review of the record, defendant's court-appointed counsel filed an opening brief and asked this court to review the record independently pursuant to *People v. Wende* (1979) 25 Cal.3d 436, 441. Defendant filed two supplemental briefs and a letter in which he contends (1) the court erred in denying the motion he made pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 during his preliminary hearing; (2) the court erred in denying his section 995 motion to set aside the information; (3) the prosecutor violated a pretrial evidentiary ruling; (4) the prosecutor deprived him of exculpatory evidence by failing to preserve the sweatshirt he was wearing on the night he was arrested and by failing to take fingerprints from a liquor bottle allegedly stolen from the burglarized residence; (5) the court erroneously instructed the jury by including instructions regarding defendant's out-of-court statements and an aiding and abetting theory, and by failing to instruct on third party culpability; (6) the court erred by failing to ensure defendant and his counsel "read PSR before sentencing"; (7) the court erred by failing to rule on his motion for new trial; and (8) the cumulative effect of these errors compels reversal.

Our independent review of the record reveals no prejudicial error. We accordingly affirm the judgment of the trial court.

**PROCEDURAL HISTORY**

Defendant was arrested for first degree burglary (§ 459). Defendant appeared at his preliminary hearing with a public defender and immediately requested a *Marsden* hearing (*People v. Marsden*, *supra*, 2 Cal.3d 118). The court held a *Marsden* hearing but denied defendant's request to substitute counsel. The preliminary hearing proceeded, and at its conclusion the court found probable cause to hold defendant to answer for the burglary. The District Attorney of the County of Los Angeles ("the People") subsequently filed an information alleging that defendant committed one count of first degree residential burglary (§ 459). The People further alleged that defendant suffered

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), two serious felony convictions (§ 667, subd.(a)(1)), and two prior prison terms (§ 667.5, subd. (b)). Defendant moved to vacate the information pursuant to section 995, subdivision (a)(2)(A). Before that motion was resolved, defendant retained private counsel. Private counsel argued the motion to vacate, which the court denied.

Defendant proceeded to trial in Los Angeles Superior Court. A jury convicted him of one count of burglary and found true the allegation that the burglary was of the first degree. (§ 459). Defendant subsequently filed a motion for new trial and a motion to strike one or both of his prior strike convictions pursuant to *People v. Romero* (1996) 13 Cal.4th 497. After defendant admitted both of his priors, the court granted his *Romero* motion in part and struck one of his prior convictions for strike purposes only, in the interest of justice. The court did not rule on defendant's motion for new trial before sentencing him to a total of 22 years in prison: an upper term of six years on the burglary count, doubled to 12 years pursuant to section 667, subdivisions (b)-(i), and section 1170.12, subdivisions (a)-(e), plus two additional five-year terms pursuant to section 667, subdivision (a)(1). The court imposed and stayed two additional one-year terms pursuant to section 667.5, subdivision (b) and section 654. The court assessed parole revocation and restitution fees of $280, a conviction assessment fee of $30, and a court security fee of $40. The court awarded defendant 744 days of custody credit, 372 for actual time and 372 for conduct.

Defendant timely appealed. His court-appointed counsel filed a *Wende* brief. (*People v. Wende*, *supra*, 25 Cal.3d 436.) On January 7, 2015, we directed appointed counsel to send the record and a copy of counsel's brief to defendant and notified defendant of his right to respond within 30 days. Defendant subsequently sought and received two extensions of time and ultimately filed a supplemental brief on April 10, 2015. Defendant filed a letter clarifying his supplemental brief on April 13, 2015 and obtained permission to file a second supplemental brief, which he filed on April 24, 2015.

Upon completing our initial review of the record, we requested that the parties submit supplemental briefing on two of the issues defendant raised in his filings: (1)

whether the prosecutor erred by eliciting testimony regarding defendant's address despite the parties' stipulation that the officer was "not to make any reference to any statements by the defendant," and (2) whether the aiding and abetting instructions given to the jury were supported by substantial evidence. Both the People and defendant's counsel timely filed letter briefs. Defendant also filed his own response.

## FACTUAL BACKGROUND

The People called three witnesses at defendant's trial: Gabriela Echeverria,[2] the resident of a home in Hawthorne that was burglarized; Hawthorne Police Department officer Kevin Pedersen, who apprehended and booked defendant; and Hawthorne Police Department officer Sean Galindo, who responded to Echeverria's home. Defendant did not call any witnesses or present any evidence.

**Echeverria's Testimony**

Echeverria testified that on April 13, 2013, she lived in the back unit of a duplex located on Manor Drive in Hawthorne. On one side of the duplex, there was a walkway from the front unit to the back unit. On the other side, there was a driveway that led to a garage. Across the driveway, but still on the same property, there was a separate house that was occupied by Echeverria's mother, father, grandparents, and brothers. Echeverria shared the back unit of the duplex with her aunt and cousin; other family members occupied the front unit of the duplex. All of the occupants of the duplex except Echeverria were out of town on April 13, 2013. To Echeverria's knowledge, no one aside from Echeverria, her mother, and her grandparents knew that everyone was out of town.

Echeverria checked to make sure the back door and screen door of her unit were locked when she left for her job as a Transportation Safety Administration airport screener around 11:25 a.m. on April 13, 2013. She turned off all of the lights in the back unit and left through the front door.

---

[2] The spelling of Gabriela's last name in the preliminary hearing transcript (Echeberria) differs from the spelling of her last name in the trial transcript (Echeverria) We use the spelling from the trial transcript.

4

Echeverria arrived home from work a little after 9:00 p.m. As she approached the back door of her unit of the duplex, she noticed the screen door was open about 12 inches. She then looked sideways and saw someone walking down the walkway alongside the duplex, about 15 feet away. She watched the person walk down the walkway, climb onto a chair or table, and hop over a 6-foot-tall cinder block wall on the edge of the property.

Echeverria noticed that the person was male. He was wearing "dark clothing," including a "dark gray hoodie or black hoodie [and] black pants." Echeverria testified that he had a medium build. She was not able to estimate his weight, but stated "[h]e was not a small person." She described his height as "[m]edium to tall," maybe five-five to six feet tall. Echeverria saw the person's left hand and noticed that he had dark skin. She could not see his right hand and could not see if he was carrying anything. The person never looked back at her, and she did not say anything to draw his attention. Based on his body structure and her work experience, she estimated that he was in his late twenties or early thirties.

Echeverria called 911 after the person left her property. A recording of her call was admitted into evidence. According to the transcript of the call, Echeverria described the person as a black male with a medium build, in his late twenties, wearing black pants and a black hoodie with the hood up. She also told the operator she thought the person went into a cream-colored house down the street.

Echeverria testified that during the call, she saw the person "power walking" or "speed walking" down the street. She saw him cross the street to the opposite side, but lost sight of him when she looked down at her cell phone. When she looked up, she could not see him anymore. She did not recall seeing any other pedestrians or cars going up or down the street.

Several police officers soon arrived at Echeverria's home. Echeverria stayed outside with some of the officers while others went into her house. Eventually, 15 to 20 minutes or less after the officers arrived, one of the officers walked into the house with Echeverria. She noticed her 42-inch flat screen television sitting on the floor by her back

5

door. When she left that morning, the television had been in her bedroom on top of her dresser.

The rest of Echeverria's bedroom "was turned upside down," "[m]eaning, everything was everywhere." Her dresser drawers were opened and some of her belongings were on her bed. She immediately noticed that her laptop was missing. She also noticed that a metal box was pulled out from under her bed, and the hookah bong it typically contained was missing. Her Michael Kors watch was missing as well, as was an unopened bottle of "1800 coconut Jose Cuervo tequila" her cousin had given her as a gift.

The walkway outside the house where Echeverria had seen the suspect was strewn with food that ordinarily was stored on top of the refrigerator or microwave. None of the doors to the house was damaged, but the screen to the kitchen window was lying outside. Echeverria could not remember whether the kitchen window was open or locked when she left that morning, but was sure the screen had been in.

About 30 minutes after she initially called 911, Echeverria was asked to accompany a police officer whose name she did not remember across the street to identify a suspect. The officer told her that the person might not be the person who burglarized her house. The officer did not tell her that the person had been found with a bottle of tequila. Echeverria agreed to look at the person but did not want to get too close to him. From a vantage point of about three houses away, Echeverria saw a police officer standing with a handcuffed person who was facing her. She told the police officer standing with her that she was unable to identify the suspect at that point because she had not seen his face. She described to the officer how she had seen the person, and the officer used his radio to call the officer standing with the suspect. That officer put the hoodie on the suspect and turned him around. At that point, Echeverria told the officer that she believed, from the body structure, height, and fit of the clothing, that the suspect was the same person she had seen outside her house.

After Echeverria identified the suspect, she walked back to her house. One of the police officers who had been at the end of the block drove up to her house and got out of his car. He was holding a full, sealed bottle of tequila. Echeverria told the officer the

bottle was hers.  The officers returned the bottle to her later that night.  None of the other items missing from Echeverria's house was ever located or returned.

Echeverria testified that she did not give anyone permission to enter her house while she was gone.  She further testified that she had never before seen the suspect in her neighborhood.  Echeverria was unable to identify defendant in court.

During cross-examination, Echeverria testified that she did not see anyone inside her residence or exiting her residence when she arrived home on April 13.  She also testified that she saw the person in her walkway for "[m]aybe like 45 seconds, 50 seconds.  It wasn't very long," and he was "almost running."  She initially conceded having testified at the preliminary hearing that she could not tell whether the person was male or female.  On redirect, the People read into the record a portion of Echeverria's preliminary hearing testimony stating that she could tell the person was a man because of his build.  Echeverria reaffirmed that testimony.

Echeverria reiterated that she saw the person's left hand and clarified that it was not covered by a glove or anything else.  She did not observe the person to be carrying anything.  Echeverria denied ever saying that the sweatshirt the suspect was wearing when she identified him was "lighter" in color than the one she saw on the perpetrator.  Echeverria confirmed that she told the 911 operator that she saw the person go to a "beige color or tan house," and stated that she did not see the person come out of that house prior to the police arriving.

**Officer Pedersen's Testimony**

Kevin Pedersen, a police officer for the Hawthorne Police Department, was on patrol duty on April 13, 2013.  He received a call about a burglary on Manor Drive and arrived in the area about a minute and half later.  He was driving a black and white patrol car but did not recall having the sirens or flashing lights on.  Officer Pedersen's goal was to locate and apprehend any fleeing suspects.  Based on the information he had from dispatch, Officer Pedersen believed the suspect was an adult African-American man, in his late twenties, medium build, wearing a black hoodie and black pants.

7

As Officer Pedersen drove northbound on Manor Drive, he saw a figure walking briskly southbound about 100 feet ahead of him. The person caught Officer Pedersen's attention because he was quickly walking away from the area where the burglary had been reported and was wearing clothing similar to that described by the 911 caller. Officer Pedersen concluded the person was male based on his structure and build. Almost immediately after he saw the man, Officer Pedersen saw him reach into his waistband and discard an item onto a grassy area. Officer Pedersen did not know what the object was, but it was large enough for him to see in the dark from about 100 feet away.

After the man discarded the item, he turned and started walking briskly eastbound toward an apartment complex. Officer Pedersen parked his patrol car and pursued the man on foot. When Officer Pedersen caught up to the man, whom he identified in court as defendant, Officer Pedersen observed that he looked very sweaty and nervous. Officer Pedersen "could see actual small balls of sweat on his forehead and his neck" even though it was not an unusually hot April night. Defendant was wearing a charcoal gray hoodie over a black shirt, black pants, and black shoes. Officer Pedersen did not recall the sweatshirt "being light in color," though he conceded he previously had testified that Echeverria told him the suspect's sweatshirt "looked lighter than the one she actually saw in the walkway." Officer Pedersen conceded it would not be unusual to see an African-American man walking on the street in this neighborhood, or for someone to be wearing a sweatshirt and gloves on an April evening.

At least one other officer, Officer Bohning, arrived to assist Officer Pedersen in detaining defendant. Officer Pedersen also saw that other officers had arrived at Echeverria's house, which he estimated was only a few hundred feet away.

Officer Pedersen searched defendant and found a black cloth glove tucked into the front of his waistband. He found a second, matching glove in the front left pocket of defendant's hoodie. He did not find in defendant's possession any items Echeverria reported missing. Officer Pedersen left defendant with Officer Bohning and returned to the area where he saw defendant drop the object about 30 seconds to one minute earlier.

8

No one else had entered that area in the meantime. Officer Pedersen found an unopened 750-milliliter bottle of coconut-flavored Jose Cuervo tequila. There were no other items nearby. Despite having a general practice of photographing evidence before moving it, Officer Pedersen did not photograph the bottle or the grassy area before retrieving the bottle. Officer Pedersen did not recommend that the bottle be fingerprinted because he had seen defendant drop it and because he did not know it was directly related to the crime, so he did not believe fingerprints were necessary. Officer Pedersen also did not photograph defendant's sweatshirt or book it as evidence. The sweatshirt was booked into defendant's personal property at the police station.

Officer Pedersen went to Echeverria's home after he detained defendant. He entered the home, investigated the crime scene, and dusted for fingerprints. Officer Pedersen did not find any fingerprints or DNA inside Echeverria's home linking defendant to the scene.

Officer Pedersen booked defendant at the police station. His booking report indicated that defendant was wearing a gray jacket; it did not mention a hoodie. Officer Pedersen also testified that defendant was 5'9" and lived in Inglewood.

**Officer Galindo's Testimony**

Sean Galindo is a Hawthorne police officer. On April 13, 2013, he was dispatched to a burglary on Manor Drive at about 9:00 p.m. According to Officer Galindo, dispatch reported that the suspect was an African-American man in his twenties, wearing a black hooded sweatshirt and black pants, last seen heading south away from the scene.

Officer Galindo drove his patrol car to Echeverria's home and spoke to Echeverria outside. Officer Galindo walked around the outside of Echeverria's duplex and noticed that the back door was open about 4-5 inches and the screen for the kitchen window was lying on the ground alongside a ceramic bowl. Based on the location of the screen and bowl, as well as the presence of food on the ground, Officer Galindo concluded that the window was the point of entry. When Officer Galindo entered the home, he noticed a flat-screen television lying on the floor just inside the door. The location of the television near the open back door led Officer Galindo to conclude that the suspect left through the

9

back door. Officer Galindo did not find any suspects inside the house. He did observe a bedroom that "appeared to have been ransacked," as well as an empty Michael Kors box.

<strong>DISCUSSION</strong>

## I.   *Marsden* **Hearing**

Defendant asserts in his letter – but not in either of his supplemental briefs – that he was denied the right to counsel of choice at his preliminary hearing. He further represents that his court-appointed appellate counsel did not send him a transcript of the *Marsden* hearing despite his requests that counsel do so. The record before this court does not contain a transcript of the *Marsden* hearing.

"The governing legal principles [derived from *Marsden*, *supra*] are well settled. 'Under the Sixth Amendment right to assistance of counsel, "'"[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."'" [Citation.] Furthermore, "'"[w]hen a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance."'" [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 95; see also *People v. Smith* (2003) 30 Cal.4th 581, 604; *People v. Hart* (1999) 20 Cal.4th 546, 603.) These principles apply "equally preconviction and postconviction." (*People v. Smith* (1993) 6 Cal.4th 684, 694.)

We review the denial of a *Marsden* motion under the abuse of discretion standard. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) "Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' [Citation.]" (*Ibid.*)

On the record before us, we are unable to conclude that the trial court abused its discretion in resolving defendant's *Marsden* motion. The transcript of defendant's preliminary hearing reflects that defendant asked for a *Marsden* hearing at the very outset

10

of the hearing. In response to defendant's request, the court properly excused everyone from the courtroom aside from defendant, his counsel, and necessary court personnel. The court then held "further proceedings," which were "reported but not transcribed herein." No transcript of the proceedings the court held is in the record. In the absence of such a transcript, we cannot determine whether the court abused its wide discretion in ruling on defendant's request, and we must presume that the court's order is correct. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["'A judgment or order of the lower court is presumed correct'" (italics added)].)

## II.     Section 995 Motion to Dismiss the Information

Defendant next contends that the trial court erred in denying his motion under section 995 to set aside the information. He argues that the People failed to adduce at the preliminary hearing sufficient evidence to link him to the crime. We disagree.

### A.     Pertinent Preliminary Hearing Evidence

The evidence concerning the identification of defendant presented at the preliminary hearing was substantially similar to that presented at trial. As is pertinent here, Echeverria testified that she saw a person wearing "dark clothing, jeans, pretty big jeans, and a big dark hood[ie], either dark gray or black," leaving her property on the evening of April 13, 2013. Echeverria could not "specifically see the color" of the hoodie because it was dark outside. However, she could see that the person had a dark-skinned hand. Echeverria initially stated that she could not tell whether the person, whom she saw from a distance of approximately 30 feet, was a man or a woman, because the person was wearing a hoodie. She later stated that she could tell the person was a man "by the build of the person." Echeverria testified that although she immediately noticed items including a laptop, a watch, and a bottle of Jose Cuervo 1800 coconut tequila were missing from her house, she did not see the man outside her house carrying anything. She also did not see him drop or throw any items.

Officer Pedersen testified that he saw a man who "very closely matched the suspect description that was provided by the victim to dispatch" walking briskly down the same street on which the burglary occurred. Officer Pedersen saw the man drop an

11

object, which he later retrieved and determined to be a bottle of Jose Cuervo coconut tequila. Officer Pedersen noted that the man was sweaty and found a pair of black gloves on his person. Officer Pedersen testified that, in his booking report, he described the man as age 30, five feet, nine inches tall, 210 pounds, and wearing a gray jacket. He also testified that he did not test the Jose Cuervo bottle for fingerprints and did not find any fingerprints in Echeverria's house.

## B.   Defendant's Motions

At the conclusion of the preliminary hearing, defendant orally moved to dismiss the charge against him. He argued that there was insufficient evidence linking him to the Echeverria burglary. He contended that the victim did not see his face, that he was wearing a gray jacket rather than the black hoodie the victim described, and that it was unreasonable to conclude that he stole items from Echeverria's house when none of the missing items was found in his possession when he was apprehended. The People argued that defendant was found, sweating profusely, less than a block away from Echeverria's residence minutes after she reported seeing a man flee her property; that the gray jacket described on the booking sheet could well have been a dark gray that was "very close to black"; and that Officer Pedersen saw him drop the distinctive bottle of Jose Cuervo 1800 tequila. The court agreed with the People that there was sufficient evidence to support a finding of probable cause. It explained, "Even for purposes of beyond a reasonable doubt, you don't necessarily need an identification to prove a burglary. A fingerprint, for example, in the house will do. The alcohol was in the house initially. The alcohol, it's a rather specific bottle of alcohol, was basically seen being dropped by [defendant] within two minutes of the incident within a block of the location."

Defendant subsequently filed a written motion to dismiss the information under section 995, subdivision (a)(2)(A), on the grounds that the People did not prove he was the person who committed the charged burglary. Again, defendant contended that he was never positively linked to the crime. He pointed to discrepancies between Echeverria's description of the suspect and his own body type and clothing, as well as the absence of forensic evidence in Echeverria's house, property in his possession, or a confession

12

linking him to the crime.  The court denied defendant's motion after hearing argument on October 8, 2013.  The record does not contain a transcript of that hearing.

**C.    Analysis**

"Section 995 provides that an information 'shall be set aside' if the defendant has been 'committed without reasonable or probable cause.'  ""Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'"' [Citations.]' [Citation.]" (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 835.)

"In determining if charges in an information can withstand a motion under section 995, neither the superior court nor the appellate court may reweigh the evidence or determine the credibility of the witnesses.  [Citations.]  Ordinarily, if there is some evidence in support of the information, the reviewing court will not inquire into its sufficiency.  [Citations.]  Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged.  [Citations.]

"'[A]lthough there must be some showing as to the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate.' [Citation.] 'Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' [Citations.]  Thus, the ultimate test is that ""[a]n information will not be set aside or prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.'"' [Citation.]" (*People v. Superior Court* (*Jurado* ) (1992) 4 Cal.App.4th 1217, 1226, italics omitted (*Jurado*).)  We review the denial of a section 995 motion de novo. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.)

Here, the evidence adduced at the preliminary hearing provided a rational basis to conclude that a residential burglary had been committed and that defendant was the perpetrator of that offense.  Echeverria called 911 to report that her back door was open and that she saw a dark-skinned man wearing "dark clothing, jeans, pretty big jeans, and

a big dark hood[ie], either dark gray or black" leaving her property. She later described in detail the property missing from her home, including a distinctive unopened bottle of Jose Cuervo coconut tequila. A police officer responding to the 911 call testified that he saw an African-American man wearing a "gray jacket" walking briskly down the same street on which the burglary was reported. He testified that the man was sweaty, had gloves, and was seen discarding an item promptly determined to be an unopened bottle of Jose Cuervo coconut tequila.

Although much of this evidence is circumstantial, a showing of probable cause may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate. (*Jurado*, *supra*, 4 Cal.App.4th at p. 1226.) Defendant contends that Echeverria's testimony was unreliable because she "had no degree of attention towards the suspect before he jumped the fence," "[h]er prior description was inconsistent with appellant," and "[t]he level of certainty was not automatic at confrontation." These contentions call into question the weight to be given of Echeverria's testimony but do not undermine its substance. Her testimony, whatever its possible faults, constituted some evidence supporting an inference that defendant was the perpetrator. The same is true of Officer Pedersen's testimony, which placed defendant near the scene of the crime and linked him to a distinctive item missing from Echeverria's house.

Defendant relies on *Birt v. Superior Court* (1973) 34 Cal.App.3d 934 (*Birt*), but that case is distinguishable. In *Birt*, a man came home to find a rental van parked outside his home and some of his belongings missing. (*Birt*, *supra*, 34 Cal.App.3d at p. 936.) He saw two adult males in the van, who threw some of his belongings at him and fled the scene on foot. (*Ibid.*) The man was unable to identify either of the perpetrators. (*Id.* at pp. 936-937.) Later, a sheriff's deputy examined the van and found a cigarette lighter on the front passenger seat. (*Id.* at p. 937.) Female defendant Birt's fingerprint was found on the lighter; other unidentified fingerprints were found on other items inside the van, including the rearview mirror, a drinking glass, and two packages of cigarettes. (*Ibid.*) The appellate court concluded the solitary fingerprint on the movable cigarette

14

lighter found inside a rental van that also contained unidentified fingerprints demonstrated at most that "at some unknown time and place, she had been inside the van; but there was no direct or circumstantial evidence to indicate when and where that had been."

*(Id.* at p. 938.) The court noted that the lighter was not shown to have been taken from the victim's house, and that "[t]here was no evidence that [defendant's] fingerprints were found either on the burglarized premises or on any of the stolen property." (*Ibid.*)

In contrast, the People's preliminary hearing evidence in this case connected defendant to Echeverria's home around the time of the burglary. He was found soon thereafter, walking briskly down her block; met at least some elements of her description of the person who jumped her fence, including key identifying elements like race, height, and clothing; and was seen discarding an item that Echeverria identified as missing from her home. While defendant's fingerprints were not found on the liquor bottle or within Echeverria's home, eyewitness testimony linked him both to the bottle and to Echeverria's address.

The evidence at the preliminary hearing supported a finding of probable cause, and the trial court did not err in denying defendant's oral and written motions to dismiss the information.

## III.    Defendant's Statement to Officer Pedersen

Defendant contends that he was harmed by the admission of a statement he may have made outside of court. First, he argues that the prosecutor violated a pretrial evidentiary ruling prohibiting reference to defendant's out-of-court statements by eliciting evidence that defendant lived in Inglewood. Second, he contends that the prosecutor referred to the impermissibly elicited evidence in closing argument. Defendant also contends that the trial court compounded the prosecutor's errors by admonishing the jury about the evidence during closing argument and instructing the jury about his statement. Defendant has not preserved these contentions for appellate review. Even if he had, we are not persuaded that the prosecutor or court erred or that defendant has demonstrated prejudicial error.

15

## A.    Background

Prior to defendant's trial, the People and defendant apparently stipulated that Officer Pedersen was "not to make any reference to statements by the defendant." (The stipulation itself is not in the record.) During direct examination, the prosecutor asked Officer Pedersen whether it was standard to obtain "some general information" about a defendant during the booking process. When Officer Pedersen responded in the affirmative, the prosecutor asked him where defendant lived. Officer Pedersen testified that defendant lived "[i]n the city of Inglewood." Defendant did not object. During cross-examination, Officer Pedersen testified that his testimony about defendant's address was based on defendant's driver's license. Later, on redirect, Officer Pedersen testified that he did not remember whether he learned about defendant's address by asking defendant or by checking his driver's license. Defendant did not object.

Prior to closing arguments, the court instructed the jury with CALCRIM No. 358 ("Evidence of Defendant's Statements") and CALCRIM No. 359 ("Corpus Delicti: Independent Evidence of a Charged Crime"). CALCRIM No. 358 provides: "You have heard evidence that the defendant made an oral statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded." CALCRIM No. 359 provides: "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed. [¶] The other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime may be proved by the defendant's statement alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable

16

doubt." The jury instructions conference appears to have occurred off the record; the record before this court does not reflect any objections by defendant.

The prosecutor did not mention defendant's address during the People's closing argument. Defendant discussed the issue at length in his own closing argument, however: "And all this stuff about, you know, well, he's from Inglewood. Inglewood, Hawthorne, what, is there a street dividing them? Is there testimony that he's from Inglewood? You [*sic*] trying to get that in there just to taint the case. You [*sic*] trying to say, oh, he's from Inglewood, convict him because he's from Inglewood. If you really want a conviction, show us that glove, show us that jacket, give us some prints. But you're asking, well, he's from Inglewood, convict him. He's from Culver City, convict him. He's from Manhattan Beach, he ain't got no reason to be over here. At least say Compton. That's a whole lot farther from Hawthorne. But that in itself, are you serious? Is that all you got? What, a street separating Inglewood. You can walk from Inglewood to - - but how would he know they were gone?"

The prosecutor responded to this argument during the People's rebuttal: "The defendant was out on those streets - - and why did I bring up Inglewood? Again, it has nothing to do with the race issue. And I know defense counsel suggested why didn't I just say Compton. I'm not sure what that really meant, but the reason you heard Inglewood is to show that he doesn't live in Hawthorne on Manor Street. He's not a pedestrian who's just out for a walk down the neighborhood." Defendant objected that the prosecutor misstated the evidence. The court did not specifically rule on the objection but admonished the jury that it was up to them "to decide if there is sufficient foundational evidence from which you wish to infer or conclude that at the time that these events occurred, [defendant] did not reside in Hawthorne, did not reside on Manor, or that he lived in Inglewood." Defendant declined the court's invitation to be heard further following the admonishment.

## B. Analysis

### 1. Prosecutorial Error

Defendant contends that the People erred at two junctures: first in eliciting testimony about his out-of-court statements despite the parties' stipulation and then in arguing about that evidence in closing. Defendant's failure to properly object to the prosecutor's conduct results in the forfeiture of these contentions on appeal. In addition, defendant has not demonstrated that he was prejudiced by the conduct.

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.) "'Under the federal Constitution, a prosecutor commits reversible misconduct [or error] only if the conduct infects the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citation.] By contrast, our state law requires reversal when a prosecutor uses "deceptive or reprehensible methods to persuade either the court or the jury" [citation] and "'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'" [citation]. To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm.' [Citation.] A claim will not be deemed forfeited due to the failure to object and request an admonition only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

Here, defendant did not object to the prosecutor's questioning of Officer Pedersen. Failure to object to an alleged violation of an evidentiary stipulation results in forfeiture on appeal of a claim that the violation amounted to prosecutorial error. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1405.) Defendant asserts that he preserved the claim by filing a motion in limine to exclude evidence of his statement, but no such motion or hearing thereon appears in the record. Additionally, the court's comments during the

18

parties' discussion of the stipulation, "whatever it was that you all decided is not going to come in," indicate that the court was unaware of the parameters of the stipulation and was not apprised of it by way of a motion in limine or other filing.

Even if defendant had objected, it is not clear that the prosecutor's question was an improper one. If the prosecutor had asked a question that was likely to elicit a reference to defendant's out-of-court statement, the question would have been error even if the prosecutor did not intend to elicit an impermissible reference. (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1405.) Here, the prosecutor's question did not necessarily implicate defendant's statements, and there was no evidence the prosecutor asked the question with the intent to do so. The prosecutor did not ask Officer Pedersen how he learned defendant's address or whether defendant made any statements. On cross-examination, Officer Pedersen testified that he learned defendant's address from defendant's driver's license. Only on redirect did Officer Pedersen testify that he may have learned defendant's address from a statement defendant made, and defendant did not object.

In any event, even if the stipulation was violated by questioning and testimony regarding defendant's address (which we do not decide), reversal is not required because any error was harmless under either *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability of harm) or *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt). Defendant himself characterizes his address as a "slight fact corroborated with other facts." We agree that defendant's address, which may have been communicated to police via defendant's driver's license rather than his own statement, was a minimal portion of the prosecutor's case. Defendant's guilt was primarily—and strongly—established by Echeverria's testimony, defendant's apprehension near the crime scene, and his disposal of the distinctive tequila bottle. Admission of testimony that defendant lived in Inglewood did not prejudice him.

Defendant also contends the prosecutor committed misconduct when he referred to defendant's address during rebuttal argument. Defendant objected at trial on the grounds that the prosecutor misstated the evidence, but such an objection did not encompass the contentions he raises on appeal. (*People v. Thomas*, *supra*, 54 Cal.4th at pp. 938-939.)

19

Moreover, the prosecutor's rebuttal arguments plainly were responsive to defendant's extended discussion of his address in closing. When we consider the challenged comments in context, we cannot conclude the prosecutor's arguments were deceptive, reprehensible, or resulted in a violation of defendant's due process rights. (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 803.) Additionally, the court admonished the jurors that it was up to them to decide where defendant lived and what weight to give that fact, and further instructed the jury that the attorneys' remarks were not evidence. We presume the jury followed these instructions and obeyed the admonishment, on which defendant expressly declined to be heard. (*People v. Scott* (2015) 61 Cal.4th 363, 399.)

### 2. Instructional Error

Defendant also challenges the court's instructing in terms of CALCRIM Nos. 358 and 359, both of which regarded his out-of-court statements. He contends "there should have been no instructions on defendant's statements if any reference to any of his statements were ruled out" pursuant to the alleged stipulation. In defendant's view, absent the testimony about his address "and instructions how to use that inadmissible statement to infer appellant's guilt," there was a reasonable probability that he would have received a more favorable outcome. We are not persuaded.

First, this argument is forfeited because the record does not reflect that defendant objected to either instruction. "Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Both instructions were correct in law. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1260-1261 [CALCRIM No. 359]; see *People v. Diaz* (2015) 60 Cal.4th 1176, 1188-1190 (*Diaz*) [CALCRIM No. 358].) Both also were responsive to the evidence, namely Officer Pedersen's testimony that defendant may have stated he lived in Inglewood. Accordingly, defendant could not preserve for appeal a challenge to these instructions without making a proper objection.

Second, even if we were to consider defendant's argument on its merits, we would not find it persuasive. Both CALCRIM Nos. 358 and 359 are cautionary instructions that

20

operate to defendants' benefit. Our Supreme Court has characterized No. 358 as cautionary (*Diaz*, *supra*, 60 Cal.4th at pp. 1184-1185), and by its terms No. 359 cautions the jury not to convict a defendant based solely upon his out-of-court statements or if the People fail to prove guilt beyond a reasonable doubt. The purpose of these instructions is to aid the jury in evaluating whether a defendant actually made a statement ascribed to him or her and what weight, if any, to give such statement. (See *Diaz*, *supra*, 60 Cal.4th at p. 1184.) We therefore have difficulty ascertaining how defendant could have been prejudiced by them, particularly where defendant did not object to the prosecutor's questions or the officer's testimony regarding the alleged out-of-court statement, and defendant himself highlighted the information allegedly contained in that statement during his closing argument.

## IV.    Preservation and Disclosure of Evidence

Defendant claims the People "failed to preserve the alleged bottle" of Jose Cuervo tequila and "destroyed appellant's gray jacket." He contends these actions violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*), and *Kyles v. Whitley* (1995) 514 U.S. 419 (*Kyles*). Defendant claims that, had the bottle and jacket been preserved properly, he "could have showed the jury that his light gray jacket could not match the suspect's description and that his prints were not on that bottle and would have ultimately exonerated him." Defendant further argues that he was prejudiced by the People's "withholding" of "the 2 most *relied* on pieces of evidence." We reject these contentions.

### A.    Background

Defendant presented a defense of mistaken identity at trial. He highlighted inconsistencies between Echeverria's descriptions of the perpetrator's clothing on the stand ("dark clothing," including a "dark gray hoodie or black hoodie [and] black pants") and during the 911 call ("black hoodie"), and attempted to impeach her by asking if she ever had said the clothing defendant wore when she identified him was "lighter" than those she saw on the perpetrator. Defendant also emphasized other weaknesses and

21

discrepancies in Echeverria's identification, including her inconsistent statements about his gender and her inability to identify him in court. His primary focus was evidence about the hoodie, sweatshirt, or jacket. During closing, defendant emphasized the varying descriptions of the garment and criticized Officer Pedersen's failure to photograph it or book it into evidence. Defendant argued that "at the very least," the People should have brought the jacket to court for the jurors to examine.

Defendant also argued the police failed to adequately connect him to the liquor bottle Officer Pedersen recovered from the grassy area. He called into question Echeverria's identification of the bottle, as well as Officer Pedersen's inability to identify the bottle upon first seeing defendant. Defendant also questioned the plausibility of Officer Pedersen's testimony that the perpetrator had a large bottle of tequila in his waistband. Defendant further argued that the tequila bottle should have been booked into evidence, photographed, and fingerprinted, or at least given to the defense so they could test it for fingerprints.

Neither the jacket nor the tequila bottle was admitted into evidence at trial. Defendant asked the jury to infer that their absence that they would have undermined the People's case.

### B.    Analysis

The due process clause of the federal constitution prohibits the prosecution from suppressing material evidence that is favorable to the defense. (*Brady*, *supra*, 373 U.S. at p. 87.) It requires the prosecution to disclose certain evidence to the defense. The duty of disclosure exists "irrespective of the good or bad faith of the prosecution" (*Brady*, *supra*, 373 U.S. at p. 87), and regardless of whether the defense has requested the evidence in question (*United States v. Agurs* (1976) 427 U.S. 97, 107; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 (*Zambrano*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22). The duty of disclosure extends to evidence that would impeach a prosecution witness (*United States v. Bagley* (1985) 473 U.S. 667, 676), as well as to "evidence known to others acting on the government's behalf, including the police" (*Kyles*, *supra*, 514 U.S. at p. 437).

22

For the purposes of *Brady*, evidence is favorable if it helps the defense or hurts the prosecution. (*Zambrano*, *supra*, 41 Cal.4th at p. 1132.) The "touchstone of materiality is a 'reasonable probability' of a different result. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]" (*Kyles*, *supra*, 514 U.S. at p. 435.) In determining whether evidence is material under this standard, we consider the effect nondisclosure may have had on defense investigations and trial strategies. (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.)

The prosecution's failure to preserve evidence also may violate a defendant's due process rights, though "[t]he duty to retain, rather than simply disclose, potentially exculpatory evidence is somewhat different." (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771.) The affirmative duty to retain or preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at p. 488.) To meet this materiality standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at p. 489.) "Destroyed evidence with only potential, rather than apparent, exculpatory value is without remedy under *Trombetta*, but *Youngblood* provides a limited remedy when the state has acted in bad faith in failing to preserve the evidence." (*People v. Lucas* (2014) 60 Cal.4th 153, 221, disapproved on other grounds in *People v. Romero* (2015) 62 Cal.4th 1, 53, fn. 19.) However, even under *Youngblood*, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Youngblood*, *supra*, 488 U.S. at p. 58.)

Here, the liquor bottle – which was not destroyed but rather returned to its rightful owner – was at best "potentially useful" to defendant. Echeverria reported a full bottle of

23

tequila missing from her house and positively identified the bottle recovered from the "grassy area" down the street as hers. Officer Pedersen testified that he saw defendant drop a large object precisely where the bottle almost immediately was recovered and did not attempt to dust the bottle for fingerprints because he personally observed defendant drop it. The record contains no evidence suggesting that Officer Pedersen made this decision in bad faith. Moreover, the police do not have an affirmative duty to discover potential evidence for the defense, such as the presence or absence of fingerprints on an object. (See *People v. Bradley* (1984) 159 Cal.App.3d 399, 405.) Additionally, the absence of fingerprints on an object does not necessarily "prove to a certainty" that the object was untouched by a particular person, as defendant suggests.

As for the jacket, defendant's claim that it was destroyed or withheld from him is not supported by the record. The evidence before us indicates that the jacket (or hoodie, or sweatshirt) defendant was wearing at the time of his arrest was booked into his personal property at the police station. There is no indication that the police acted in bad faith by booking the jacket into defendant's property, or that they or the prosecutor withheld from defendant the jacket or any of the varying accounts of its hue and styling. In any event, defendant cross-examined witnesses about the color and styling of the jacket and argued to the jury that the jacket he was wearing was lighter in color than that worn by the perpetrator Echeverria described to the 911 operator.

To the extent defendant's claim that the jacket should have been booked into evidence is a claim challenging the strength of the evidence that was admitted, we conclude that sufficient evidence supported his conviction. When considering a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it contains reasonable, credible evidence of solid value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (2015) 60 Cal.4th 966, 988.) That standard is met here: eyewitness testimony placed defendant at the scene of the crime; he was apprehended a few minutes later near the crime scene, nervous, sweaty, and in possession

24

of gloves; and a witness saw him drop an item that was later determined to have been stolen from the crime scene.

## V.     Jury Instructions

Defendant argues that the court made two additional errors when instructing the jury. He contends that the court improperly instructed the jury on an aiding and abetting theory because such that theory was not supported by the evidence and was not argued by the People. He also contends that the court improperly *failed* to instruct the jury on third-party culpability. We disagree on both points.

### A.     Aiding and Abetting

#### 1.     Background

The court instructed the jury with CALCRIM No. 1702 ("Burglary: Intent of Aider and Abettor"). That instruction provides: "To be guilty of burglary as an aider and abettor, the defendant must have known of the perpetrator's unlawful purpose and must have formed the intent to aid, facilitate, promote, instigate, or encourage the commission of the burglary before the perpetrator finally left the structure." The record does not reflect that defendant objected to this or any other instruction, or requested any additional instructions that were not given.

During the People's closing argument, defendant objected to the People's comment that some of the jurors were victims of burglaries. The court called a sidebar to address that objection. During sidebar, the court stated that it would admonish the jurors. The following exchange also occurred:

The Court: "Do you intend to argue that even if there is no evidence - - because you have no evidence he was ever in the house. You have no evidence of that. There's no prints, you got nothing - - do you intend to argue that somebody was in that house and that he was a participant in this crime, yes or no? Do you intend - - are you going to leave it alone and argue that he was the one in the house? Because - - "

"[The People]: I don't know if he was the one in the house so I will need the aiding and abetting.

"The Court: Okay.

25

"[Defense counsel]: I would move to strike it. I don't see there's any evidence of aiding and abetting.

"The Court: Firstly, I already gave that instruction yesterday. But what I didn't do is give both the instructions. Because if I give one, which is the 1600 - - we've already went [*sic*] over this, you didn't object to it yesterday, so it's been read. But what I - - honestly, lying in bed, I was thinking about it and thought you know what, I think I'm also supposed to give something else if I give that, because that's just a bare instruction. And the instruction I think is - - what is it? 1700 or 16 something. 1702. So the instruction is 1702, and it says here, the court has a sua sponte duty to give this instruction when the defendant is charged with aiding and abetting a burglary and there is an issue about whether the defendant allegedly formed the intent to aid and abet. This instruction must be given with 401, aiding and abetting crimes.

"And let's see here. Going over to 401, it's - - this - - it's 401. So here's what I want to tell you guys. I am going to give 401 as well. I'm going to print it out right now. And you will have it for your argument. Because when it's all done, when it's all over, I will, so as not to highlight this over any other one, I will read over again just the burglary, all the burglary stuff and then these two, and then I'll just merge them. They won't notice the difference. I don't want to point out something about it."

The court instructed the jury with CALCRIM Nos. 400 ("Aiding and Abetting: General Principles") and 401 ("Aiding and Abetting: Intended Crimes"). It did so in the manner it said it would, upon conclusion of the closing arguments.

During the People's closing, after the sidebar discussed above, the prosecutor argued that "[t]here could have been someone helping the defendant" with the burglary and removal and disposal of Echeverria's items. Defendant more explicitly referred to aiding and abetting during his closing argument. He told the jury, "I won't be able to come back up here so I have to anticipate what she's going to try to argue now because she's argued initially that my client planned this, knew they were going to be out of town, went in there. So what is she left with? That he was an aider and abetter [*sic*], that he did this with somebody, that some perpetrator committed the crime that he knew, and I'm

26

just looking at the jury instruction, that kind of thing, and he was aiding this person. Who's the perpetrator? What evidence do we have of the person that did this?" The People did not address aiding and abetting in rebuttal.

### 2. Analysis

"Even without a request, a trial court is obliged to instruct on '"general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case"' [citation] . . . . In particular, instructions delineating an aiding and abetting theory of liability must be given when such derivative culpability 'form[s] a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 488.) "A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given. [Citation.] 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]' [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

Here, derivative culpability did not form the basis of the prosecutor's theory. Nor did substantial evidence suggest the involvement of anyone other than defendant in the crime; the only suggestion of a second person's involvement in the crime was made by the prosecutor during the People's closing argument. Thus, the court was not required to give an aiding and abetting instruction and erred in doing so.

The question then becomes whether the court committed reversible error by delivering an aiding and abetting instruction. The answer to that question is no. Nothing in the record indicates that defendant would have achieved a more favorable result had the instruction not been given. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Under *Watson*, our review "focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration."

27

(*People v. Breverman* (1998) 19 Cal.4th 142, 177.) The evidence supporting the existing judgment is strong, and there is no reasonable probability that the giving of the irrelevant aiding and abetting instruction affected the result, particularly where the court also told the jury that some of the instructions it was receiving "may not apply, depending on your findings about the facts of the case."

## B. Third Party Culpability

Defendant's trial counsel did not ask for a pinpoint instruction on third party culpability, but he contends the trial court had a sua sponte obligation to give such an instruction even in the absence of a request. As the Supreme Court held in *People v. Abilez* (2007) 41 Cal.4th 472, 517 (*Abilez*) and in *People v. Gutierrez* (2009) 45 Cal.4th 789, 824-825 (*Gutierrez*), the trial court has no such duty.

"The applicable principles are clear. A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it. [Citation.] A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation] Finally, a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses '"that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."'" [Citation.]" (*Abilez*, *supra*, 41 Cal.4th at p. 517.) Defendant bears the burden of requesting pinpoint instructions. (*Gutierrez*, *supra*, 45 Cal.4th at p. 824.) "'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' [Citations.]" (*Ibid.*)

The jury properly was instructed that defendant was presumed innocent and that to convict him, the jury had to find him guilty beyond a reasonable doubt. Had the jury

28

entertained a reasonable doubt that defendant burglarized Echeverria's home and instead believed another person committed those crimes, presumably it would have acquitted defendant. Moreover, defendant did not introduce any evidence of third party culpability. No special instruction on third party culpability was necessary to apprise the jury of the pertinent legal principles. (*Abilez*, *supra*, 41 Cal.4th at p. 517; *Gutierrez*, *supra*, 45 Cal.4th at pp. 824-825.)

## VI.     "Read PSR Before Sentencing"

In his letter, defendant contends in a single sentence that the trial court erred by failing to ensure that he and his counsel "read PSR before sentencing." We are not certain what, precisely, defendant is claiming, but our review of the record and applicable law reveals no reversible error. Section 1203, subdivision (b)(1) requires the court to refer a matter to a probation officer for investigation of the crime and the defendant's criminal history where the defendant is convicted of a felony and is eligible for probation. Defendant correctly conceded that he was ineligible for probation. The court accordingly was not obligated to obtain a presentence report. Since the court was not obligated to obtain a report, it could not possibly have been required to review that report with defendant and his counsel.

To the extent defendant may be suggesting his counsel failed to adequately review the probation officer's report, such suggestion is belied by the record. Defense counsel filed a motion to strike defendant's prior strike convictions that were enumerated in the report. Defense counsel also obtained and submitted to the court police reports pertaining to those convictions and argued that defendant lacked a history of violence.

## VII.   Motion for New Trial

Defendant contends that the court erred in failing to rule on his motion for new trial. Defendant forfeited this challenge by neglecting to press for a hearing or otherwise acquiescing in the court's failure to hear the motion.

Section 1202 provides that in pertinent part that "'If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the

29

defendant shall be entitled to a new trial.'" Our Supreme Court has interpreted this statute to require a defendant seeking its protections to "promptly object and demand a new trial" if he wishes to preserve the issue for appeal. (*People v. Braxton* (2004) 34 Cal.4th 798, 812, 814.) "If the trial court's failure to hear or rule on the new trial motion appears to be inadvertent," as it does from the record in this case, "the defendant must make some appropriate effort to obtain the hearing or ruling." (*Id.* at p. 813.) "This is an application of the broader rule that a party may not challenge on appeal a procedural error or omission if the party acquiesced by failing to object or protest under circumstances indicating that the error or omission probably was inadvertent." (*Ibid.*) "'"In the hurry of the trial many things may be, and are, overlooked which readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." [Citation.]' [Citations.]" (*Id.* at p. 814.)

Here, defendant made a timely motion for new trial. He concurrently filed a motion requesting that the court strike one or both of his prior strikes and a statement in mitigation. The trial court addressed the latter two filings at a hearing but proceeded directly into a bench trial on defendant's priors and sentencing without addressing the motion for new trial. Defendant did not mention the court's omission, which appears to have been inadvertent. Accordingly, he cannot raise the issue here.

Even if were we able to review it, we would not reverse because defendant cannot demonstrate actual prejudice or a miscarriage of justice. (*People v. Braxton*, *supra*, 34 Cal.4th at pp. 817-818.) "[A] new trial may not be ordered for a trial court's failure to hear a new trial motion when a reviewing court has properly determined that the defendant suffered no prejudice as a result. This will occur when, for example, the record shows that the trial court would have denied the new trial motion and the reviewing court properly determines that the ruling would not have been an abuse of discretion, or the reviewing court properly determines as a matter of law that the motion lacked merit." (*Id.* at p. 818.) Similarly, "[a] trial court's refusal to hear a new trial motion does not result in a miscarriage of justice if the appellate record allows the reviewing court to

30

determine, as a matter of law, that the new trial motion lacked merit or that the trial would properly have exercised its discretion to deny the motion." (*Id.* at p. 820.)

Here, the record demonstrates that defendant's new trial motion was not meritorious. His motion was predicated entirely on a purported "total lack of eyewitness identification and scientific evidence to support a conviction of Defendant for the subject crime." Despite Echeverria's inability to identify defendant in court and the absence of fingerprints and DNA at the scene, the circumstantial evidence against defendant was substantial and supported the inference that he was guilty beyond a reasonable doubt. He was apprehended mere blocks from Echeverria's home, on the same street, shortly after the burglary. He was unusually sweaty and nervous. He was carrying gloves. He was seen dropping an object later determined to be a distinctive bottle of liquor identical to one reported missing from Echeverria's home. (See 2 Witkin, Cal. Crim. Law 4th (2012) § 157, subd. (1) ["In a prosecution for burglary, proof of the defendant's possession of stolen property is one of the strongest of incriminating circumstances."].) Regardless of the precise hue of the jacket he was wearing, he matched several physical attributes of the suspect Echeverria saw in the walkway next to her home, including height, race, gender, and age. As a matter of law, the trial court properly would have exercised its discretion to deny the motion.

## VIII. Cumulative Error

Defendant's final contention is that his conviction should be reversed due to the cumulative effect of the various errors he alleges. The only error we found, that pertaining to the aiding and abetting instruction, was harmless. We therefore reject defendant's argument that an accumulation of errors prejudiced him and warrants reversal.

Defendant has, by virtue of counsel's compliance with the *Wende* procedure and our review of the record, received adequate and effective appellate review of the

31

judgment entered against him in this case.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278; *People v. Kelly* (2006) 40 Cal.4th 106, 112-113.)[3]


**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

---

[3]     Because defendant has appointed appellate counsel and the court has thoroughly reviewed the record, defendant's request in his September 25, 2015 filing that new counsel be appointed is denied.  We also deny his request that we take judicial notice of *People v. Osband* (1996) 13 Cal.4th 622, 693-701,which addresses prosecutorial misconduct and ineffective assistance of counsel.  Defendant's claim of prosecutorial misconduct does not have merit, and his theory of ineffective assistance was not timely presented.